All right our last case this morning is number 21-12985, subscriber Holdings LLC v. Brightstar Corporation et al. Mr. Halderman, whenever you're ready. Good morning, may it please the court, my name is Mark Halderman on behalf of subscriber Holdings LLC, the appellant in this case. In this trade secret case the district court below erred by denying subscribers motions to compel and then granting summary judgment on an incomplete record despite there being existing issues of material fact. First the district court erred by determining that what subscriber had identified was too broad and lacked sufficient concreteness to be a protectable trade secret. Well what do you, the district court said, and I'm going to ask you what you disagree with. The district court said that the trade secret was the subscriber assurance program which it described as a subscriber default slash attrition protection product. Was that accurate? So that characterization is based on a portion of the program guide and it does describe the contractual default as a portion of it, but the other portions of the slide describe the trade secret which is the specific concept of using risk management techniques. Wait, I want you to describe exactly for me, so go slowly so I can write it down, exactly what you believe the trade secret is and what consists of. So the trade secret, it's the concept of using risk mitigation techniques and the ones that are specifically mentioned in the program in the pricing guide would be insurance, assurance, and risk-based pricing, but they use them for the specific purpose of facilitating early upgrade programs that enable subscribers to obtain the latest and greatest smartphones before fulfilling what was then the standard two-year wireless service contracts and without paying early termination fees. Wait, hold on, hold on. Sorry. I'm not, I don't write as fast as you speak. Hold on one second. Okay, I'm going to try to read it back to you, okay? Sure. And I may have missed a word or two, but the concept of using risk mitigation techniques such as insurance, assurance, and risk-based pricing for facilitating upgrade programs that allow customers to get smartphones before the normal two-year period of enlistment is up. And without paying early termination fees. And it was, that was the standard at the time. Okay, what did the, what did the, of all of that you told me, what did the district court miss in describing the alleged trade secret? The district court completely discounted the early upgrade program portion of the trade secret. What the district court said was the trade secret is subscriber default insurance with very specific triggering events such as in the event of divorce, death, or deployment. But that is only one portion of the trade secret and it disregards other slides and some of the other disclosures that were provided to BrightStar teach how to enable early upgrade programs by using risk management components to protect the wireless carriers collateral, which would be the subsidized phones. You made these arguments in the district court, you sold the district court, this is what our trade secret consists of and you've described it in the way you described it to us now? I mean, I believe reasonably similar. I don't know if this verbatim, but yeah, yes. In substance, yes. Yes. Okay, now let's talk about the district court's rationale for granting summary judgment against you. The district court said that the subscriber assurance program, which you've said is broader than the district court thought, but that it was not a protectable trade secret and gave a couple of reasons. One of the reasons was that you had, you, the principal of subscriber holdings, had disclosed the essence of the agreement in two fundamental ways. One was the call with Mr. Bernanke before the non-disclosure agreement was entered into, and there are emails that support that in part at least, and the second was the 2010 patent application. So tell me what the district court got wrong about public disclosure. Well, so the public disclosure issue primarily fails because it's based on the district court's assumption that this default insurance program, ignoring all of the early upgrade component portion, that that was disclosed in the email and the patent application. It made no finding that the early upgrade portion was previously disclosed. And I would say additionally to that, the emails, the pre-NDA emails, happened just before an NDA was signed, and I believe that in the, and there's some case law in the briefing to support this, that those emails, that Brightstar knew those emails were to be kept confidential as the parties were in the process of negotiating an NDA. Well, what did the patent application consist of? So the patent application, it described, it was essentially, it essentially described a risk mitigation for like leasing real estate. It didn't mention early upgrades. No, it did not mention early upgrades. And I think another problem with that particular argument or justification by the court is also that they didn't compare the patent or they didn't have any evidence other than the attorney argument that that patent disclosed the secret. And I don't think it was enough for the district court to just look at a patent application and say, oh yeah, disclosed it. I think that would be an issue of conclude that that did in fact disclose the trade secret. Well, that's right in some respects, but I don't think it's right in others. So if the patent, if the patent, let's say the 2010 patent disclosed the invention exactly the way you described it to me, you could rely on the patent, could you not? I mean, I think if it described it verbatim, you could, but I mean, there wouldn't be a problem, right? And that's a hypothetical question. I would agree if it described it verbatim, but I mean, first of all, it doesn't apply to wireless devices at all. I know. I'm giving you a hypothetical. I'm not saying that's the case. I would say if it disclosed it verbatim. Right. So in some cases, you can just, you could rely on the patent. Your point is that here, given what this patent involved, you needed much more. Correct, Your Honor. Can I ask you a question about tying the conduct, the alleged conduct to the defendant here? What exactly do you mean by tying it? Well, because it was not the defendant's company that, it was T-Mobile, right, that originally? Right. And I think I understand your question now. So we believe that what BrightStar did was take our trade secret, and they had a contract with Apple that just started shortly before the T-Mobile upgrade program to be the, we haven't seen the contract because they didn't produce it, but to take all the early upgrades from Apple. So we believe that they got that contract with Apple because of this idea of early upgrades, which would then allow BrightStar's business to exponentially increase because they would suddenly be getting a lot more traded, a lot more phones would be traded in. So, I mean, the misappropriation doesn't have to be. How does T-Mobile factor into this? Well, because Apple and T-Mobile had a relationship. So it was, T-Mobile did not offer Apple's phones until slightly before the release of T-Mobile's Jump program. So we believe that it was, you know, it was this communication with Apple and T-Mobile, I mean, these programs involve the phone manufacturers, the wireless carriers, and the insurance and device buyback companies like BrightStar. And it was, you know, this, it was all of them working together. And BrightStar, to misappropriate, they didn't have to offer the program themselves. All they had to do was misuse our information and disclose the, improperly disclose the idea to another party. But because we never got, and we got 15 non-public emails that were all explicitly mentioned, either our client's name or the company name, and we just have no way of knowing what they did with our idea. My, I have 20 seconds left. I don't know if you have any. I don't. I'd like you to discuss the other issue that you've raised. You've got a discovery issue that you presume or not. Right. So, yes. So we. Tell me in a nutshell why the two reasons the district judge gave for denying discovery was wrong. Well, they, the district court didn't really give any reason. It just said that BrightStar had substantially responded to our deadline for discovery expired. Our first motion to compel was pending for over four months. And then after discovery expired, they denied it. So we only got 15 documents. We didn't get the key contracts with T-Mobile or with Apple. We didn't get any emails between those parties. We didn't get executive meeting minutes that happened, you know, in the months after the NDA was executed with our client. We didn't even get an organizational chart. We barely got anything at all. And the reason that they said that the, or a second reason that BrightStar argues is that our requests were unduly burdensome, but they provided absolutely no evidence of burden. They didn't have a declaration saying that, you know, our requests resulted in thousands of documents and there were hundreds of custodians. There was no evidence. And Georgia law requires, you know, the defendant to come forth with evidence that says that the burden is actually justifiable. And they didn't make that burden. And for the court to conclusory, conclusorily deny it after discovery just worked a substantial injustice to our client. This is not a Georgia law issue though, right? It's a federal law discovery issue. Well, there are cases, and I believe in our briefing we cited the cases in the northern district of Georgia. You have to apply federal discovery standards, right, on relevance and everything else. Well, there is also the, for trade secrets, there's the reasonable particularity standard, which says that you have to identify the trade secret such that the defendant has notice of your claim and can respond to your discovery, which I believe that we did in our requests. And in fact, Clayton Bodnarik, who was Brightstar's former vice president of sales, admitted that Brightstar has expertise in early upgrade programs. So for them to pretend that they don't know what we're talking about, I just think was completely disingenuous. All right. All right. Thank you very much, Mr. Halderman. Ms. Ball. Good morning. May it please the court. Your Honor, has hit upon, I believe, that the initial questions that Judge Jordan, you were asking, really drives to this case, is what was the trade secret? And the trade secret, unlike some other cases where you have employees that help develop a trade secret at a company and then leave, and the company really doesn't know, what did you take? What, you know, what of the hundreds that you took are you using and exploiting? That's not the situation here. There are approximately three phone calls other than emails of setting up a phone call. There are two emails with real substance. There are two PowerPoint presentations and a Excel spreadsheet. We know exactly what it is. And that was always a discovery, and it was admitted in response to Statement of Materials Fact Number 28 at Summary Judgment, that the trade secret is the Subscriber Assurance Program as set forth in the two program guides and the pricing guides. And while Subscriber Holdings says, okay, but you shouldn't actually look at what it says in the document. You should listen to what I'm telling you it really should have been. That's not the standard, and there's no precedent for that. Well, Mr. Halderman says that one of the slides deals with the program upgrades as well, and the District Court didn't factor that into its definition of what the trade secret was. What the program guides describe is a Subscriber Assurance, an insurance policy that would pay the device subsidy costs and any early contract price if there are certain types of defaults. And while they normally enumerate out death, disablement, et cetera, there is a slide that gives an example of an early upgrade in there. However, the product itself is still an insurance program that would pay, that you would have the premium, you would have the monthly premiums, you would have a deductible, and then you would have the contract termination fees and any device subsidy costs that had not been recovered would be paid by the insurance costs. Early upgrade, which would be a default under the contract at that time, which required the user to maintain that contract and not have another phone for that two years, is just another enumeration. It is another situation or trigger. Yes. So let me ask you a question, though. Would you agree that what the trade secret is, is a question of fact? In general, what is? Yes. Yes. Okay. And if the trade secret is found in the documents and slides that you have pointed to, and there is a disagreement about what those documents and slides suggest the trade secret is, why isn't that a jury question? Because similar to whenever you have a contract claim and you have a document and everyone agrees, yes, this is the term, and there is no argued ambiguity, the court is able to read what Subscriber Holdings itself termed in this case was the plain English of those program guides and look at it and say, what does it do? And in fact, this case, which I find is probably a rarity, the document itself specifically answers the question, what is Subscriber Assurance? And it does not say it's an early upgrade program. What it says is it is a Subscriber Attrition and Default Insurance product. And so in this case, there is no ambiguity. There's no question of fact. We all agree these documents are the trade secret and that that's what's set forth there. In fact, Subscriber Holdings in discovery. Well, you don't all agree. I mean, that's why we're here, right? You know, and there is reference in the slide to the early upgrade component, and I can't remember now. For some reason, I feel like I saw it somewhere else, too, but I might be misremembering. I mean, so I agree with you that sometimes that there are matters of fact that, you know, there's really not any kind of fair dispute over. But I guess I need you to tell me why specifically the reference to the early upgrades is clearly not a part of what this trade secret is here. Because that would be the benefit or the outcome or the usage of the trade secret. And so similar to the case law that talks about how identifying software that performs this function or a method of doing XYZ, that's not the trade secret. The trade secret itself is the software. You've got to actually look at, you know, the code, whatever it is that's going to be done. Here, what we had is a subscriber default insurance product. But if the purpose of paying the premiums for the insurance is to facilitate an early upgrade because they're paying all this money anyway, so some of it, I guess, is going to the early upgrade. Why isn't that a necessary part of the trade secret? That is actually not set forth in their trade secret. That money actually would not necessarily go to the upgrade. What the monthly payment was, was a premium for the insurance to cover any of your defaults. Right. But it seems to me that, like, as a matter of common sense, the only way you could provide the early upgrade would be if some of the money from the premium for that insurance factored in some way into paying off the phone early enough that you could get an upgrade. Maybe I'm missing something. It would be as any insurance product is taken in consideration of what your premium would be based upon the risk that you would expect there to have to be a payment on the insurance policy. So just as one of Brightstar's products is for device protection, if you drop your cell phone and you shatter a screen, some people will never make a claim. You will continue to make your premium payments. Other people will. That all gets factored into pricing. Same here. There might be subscribers or end users who have this product who never have a default. They never have that disability, you know, decide to upgrade. And so that gets factored in versus the person who may also. And subscriber holdings itself even admitted during discovering the 30B6 deposition that the actual terms of the upgrade program are not in the program guide. That would all be set by the wireless carrier, because the wireless carrier would actually have to make all of those decisions. And the wireless carrier would have to decide how much of the device will it subsidize. How long are you going to have to go into the policy before you can have that trigger? Any of those things. None of that is actually in their materials that they claim to be a trade secret. So while they have an insurance product in their materials that may be utilized to support that as an end benefit, or just for any of the other products. It's an end benefit or the use that they may try to sell it for. Maybe an early upgrade idea. That might be why many people may want it. Other people might, you know, first be a divorce, a loss of job, who knows. But the insurance product itself is actually what was disclosed and put in there. So are you saying then that the mentions of the early upgrade are not specific enough to constitute part of the trade secret? I am saying that they are listed as a benefit enough, I guess. I don't know. The mention of the ability to use it for the benefit of an early upgrade is simply the benefit or the function of why you would use this trade secret. In terms of what, during discovery, subscriber holdings attempted to say, our trade secret is an early upgrade program with risk management component. And we would say, what does risk management component mean? And the response was, well, it could be insurance. It could be assurance. It could even be just deciding how to price a policy allowing you to do an upgrade of, you know, in any way. In fact, and so we asked, does that actually mean then any early upgrade program would be implicated in your trade secret? And the answer was yes. And so if you were to take their argument of what the document means, that it's early upgrade with risk management component and risk management component could be anything, even though it's not described in the documents that they sent, even though it's not set forth in these, the documents that they claim actually contain the trade secret, then what you are going with is something that is too amorphous to actually claim as a trade secret because it is literally everything and anything, even though they agree that they have not set forth pricing terms, you know, how long, you know, any of these things. And so if you were to take the way that they argue it is, it does become too much. If you actually look at what the documents show, it is something that would be enough to be considered a trade secret. And then you move on through the rest of the analysis of was it maintained, you know, is it publicly known? Do they derive any benefit from it not being publicly known? And then did they maintain the appropriate security methods? But the way that they attempt to argue it, because they try to encapsulate everything, right? Because they want it to be every single early upgrade program that has existed ever since T-Mobile's Jump program in 2013. And there are many different programs, and they have evolved over the years, and they don't look at all the same. But their contention is all of those implicate their trade secret, because it would be anything that manages the risk management component, including pricing. Mr. Halderman says the district court got the public disclosure aspect of its order wrong. For example, with the patent, that the patent didn't disclose everything that the trade secret is composed of. And the same goes for at least some of the emails between the principals of Subscriber Holdings and BrightStar. Can you respond to that? Yes, Your Honor. First, I'll respond to the email. The email was not an email that came from Subscriber Holdings. The email was an email from Clay Bodnarek, who was at BrightStar Device Protection, to one of his superiors at BrightStar Device Protection and BrightStar Corp. And these are different entities, by the way, despite how they are sometimes argued by Subscriber Holdings. Now, Mr. Bodnarek had had one phone call with Sean Woodward, the principal of Subscriber Holdings. Mr. Woodward described that he gave his, quote, elevator pitch. And Clay Bodnarek also said, we talked about the product for a while. And then what he did was he put down what he understood and had heard from Mr. Woodward as this elevator pitch in an email to his colleagues. And his email sets forth specifically, when a subscriber signs a two-year contract with a wireless service provider, that's exactly what they're talking about, the back then, all these contracts for two years, they would be offered this contract insurance, the Subscriber Default Insurance product. The contract insurance would be billed on a monthly basis, exactly as set forth in the first program guide and second. The insurance would protect against named perils, such as loss of job, divorce, disability, military assignment, relocation, et cetera. And then if the subscriber needed to break the contract for any of these reasons, the policy would pay the contract breakage penalty. The program could be offered directly by a carrier or through indirect channels similar to how eSecurital, which was then BrightStar Device Protection, offered insurance coverage today. That is the exact thing that is set forth in the program guide. In fact, it includes relocation that the program guide doesn't. So theoretically, the elevator pitch included more evidence of perils than the program guide did once it was sent. There was no confidential relationship. There was no nondisclosure yet. The nondisclosure occurred later. At this point in time, they were trying to determine, is there enough here that we even have interest in entering a nondisclosure to actually learn more about? So there were no protections in place right here. They were deciding whether they even wanted to have discussions. In terms of for the patent, Your Honor, the patent disclosure sets forth, and I'm going to jump around within the disclosure. It's all in the briefing, but it is longer, so I will not read it all to you. But it sets forth, again, the idea of using an insurance policy figure in a situation where you have payments being spread out over time. And so you have the risk of someone defaulting and you losing out on your benefit of the bargain, your entire contract price. And so there is an insurance policy put in place that if that breach occurs, you get your policy, you get all the payments you would be expecting. And that most people prefer to do it that way because for cash management reasons, it is a lot easier for us to make monthly payments instead of a larger upfront payment. However, that, of course, puts the risk on the provider of either the service or the good, but they will lose out on that money. And so the patent disclosure sets forth this exact situation, which is the exact situation that Mr. Woodward described as the reason for his program guide or for the Subscriber Assurance Program. And then says, instead, we use this loss mitigation instrument, which could be acquired by the leasee or the leasor and may provide the prepayment leaser in the case of the leasee incursive financial hardships, such as a loss of a job or bankruptcy that prevents the leasee from making the payments. And then it also talks about making an analysis to determine the probability of the default to determine the cost, which is the exact risk management component, not only insurance, but the pricing determination that subscriber holdings disclosed in the program guides and the pricing guide. It is the same situation, and that is set forth in some of the case law, including Wilson versus Barton and Ludwig, which is cited in our brief, that when you have the exact same idea that has been disclosed publicly and just put to a different use, that does not make a trade secret. It is not a trade secret here, and it is not a trade secret in that case. And so here we have not only the very explicit description of the product in this elevator pitch before any protections, but we also have two years prior a patent application which sets forth the exact same concept in an amorphous, any kind of lease or leasee position versus as set specific to a cell phone. Yes, Your Honor. That was my question to you. Did the patent application include any limitations as to industry or product? It does not, Your Honor. If there are no further questions, I believe I am out of time. All right, thank you very much. Thank you. So I would like to address a few of the points that you made. First, I would like to say that the Eleventh Circuit recognizes that trade secret law offers very broad protection, including ideas. And this idea of allowing a risk management component that facilitates early upgrades was not known anywhere and was not utilized until T-Mobile Jump was released in 2013. What about your friend's argument that the upgrade component really isn't set forth as a part of the trade secret itself, but rather as sort of an example of how you could sell the product, along with other examples? I'm going to respectfully disagree with that. And for one, it doesn't make sense because, first of all, the district court's interpretation entirely reads out the early upgrade component from the program guide. And as an example, if a dead subscriber or any defaulting subscriber, for that matter, they have no use to upgrade their phone. So if the trade secret is just limited to insurance, all of that talk of upgrading your phone early, it doesn't make any sense. And because the point of the trade secret is that it protects the wireless carrier's collateral, their device subsidy. And because it protects that device subsidy, it allows them to offer these phones early. Where does it say that in the materials? It says, if you look at 130-7 at 3 and 8. 130 is the document number? Yes. And so these disclosures, they teach how to enable early upgrade programs by using these risk management components to protect the collateral by mitigating the risk to subscribers. And because they're mitigated, they can offer the early upgrade programs. And it's our opinion that that is a disputed fact. And reading out the early upgrade program entirely... Let's go to that disputed fact thing. So, and back to Judge Rosenbaum's about possible disputes of fact. Ms. Ball says that you agreed with and accepted paragraph 28 of their statement of material facts, which set out what the alleged trade secret was. Is that correct? So, I believe what we said is that it's the subscriber assurance program as described in the program and pricing guides, which include all of this disclosure of early upgrades. Right. Well, this is what they say in their paragraph 28. And they say you agreed to it. I haven't looked at your response to their statement of material facts. But paragraph 28 says the alleged trade secret is subscriber assurance in capital letters contained in the first program guide, the second program guide, and the pricing guide. Correct. Is that accurate? They say you agreed to that. We did agree to that. And it's for the most part, it is accurate, except that I will say that Take the name out. The alleged trade secret is whatever. Is in those guides. It's all described in those guides. So, there's really no... We can read those documents for ourselves. There's no dispute. Whatever the first program guide, the second program guide, and the pricing guide provide, that's the trade secret, right? Correct. Okay. And I will just say that she mentioned that, well, it's the DeRubis case, the district court said that a benefit cannot be a trade secret. But that's not what that court said. What it said is that in that case, the plaintiff did not identify any trade secret at all. They merely identified the end result. So, they said that it was software or algorithms that perform X, Y, and Z functionality. But that's not what we did here. We specifically identified the trade secret itself as this concept that was at the time secret. And whether or not it was not known at the time, that is the real dispute. And that should have been fleshed out in discovery. But because we got none, here we are today. Did you take Mr. Bonorek's deposition? He was a non-party witness. We did take his deposition. And most of his answers were, I do not recall. And we didn't have an opportunity to take a 30B-6. We noticed one up, but they limited all of the topics to their unilateral interpretation of the trade secret. And with the motions to compel pending, we were hoping that the court would make a ruling before we took the depositions because BrightStar refused to put the witness on again if we won the motions to compel. And we just thought it would be a waste of time with an uneducated witness and with no documents to go in there. But unfortunately, we did not learn about the decisions on the motions to compel until after discovery ended. And I'll add that that was a proposed order, the scheduling order. The scheduling order wasn't even entered officially until after the deadline for discovery. We requested an emergency status conference. We requested an extension of discovery. And the district court denied them both with one-sentence orders. So we really just never had an opportunity to flesh out our case at all. Now, all of that discovery went to whether or not there were violations or breaches, not to whether or not, not as to what the trade secret consisted of, right? For the most part, I would agree. It seems to me from your disagreement here at Oral Argument that the disagreement centers on the upgrade portion and whether or not that is an essential component of the trade secret or simply just an example of how the product can be used. But there's no other discovery you could have gotten to figure out what the trade secret was, right? Well, I would agree with that for the most part. I guess I would say that to the extent the district court denied it for being too broad, if we, you know, we could potentially refine some parts of the trade secret to, you know, for example, just include an insurance component and that could lessen some discovery burden. But for the most part, I believe you are correct. Other than discovery could show that there were no other products out there. And I think if you look at the trade secret back in 2012 and what was known in 2012, I think that identifying a novel idea helps show that the trade secret was in fact concrete because it just didn't exist before. It's not like today where there's, you know, there's hundreds of different early upgrade programs that were not. All right. Thank you very much, Mr. Halderman. Thank you, Your Honor. We're in recess for today.